We'll hear from you, Representative Daniel Valdez. Good morning. May it please the Court, Counsel. My name is Craig Johnston. I represent the plaintiff of health in this matter, Mr. Daniel Valdez. We believe that the trial court erred in granting a motion for summary judgment in favor of the defendant, Appalee University Medical Center, who I will probably refer to a lot this morning as UMC, just because that's the way they're referred to typically in a lot of cases. This case is a Title VII retaliation case. Mr. Valdez is a former employee at UMC. He was a male PICU nurse. He was a pediatric intensive care nurse in the PICU department at UMC. He was a male nurse in a department that was predominantly female. Mr. Valdez claims that he was retaliated against after he made a claim of discrimination and harassment to his supervisor. UMC filed a motion for summary judgment in this case, claiming that Mr. Valdez, one, did not engage in a protected activity because, according to UMC, the conduct complained of by him could not have constituted conduct prohibited by Title VII. UMC also filed a summary judgment on the grounds that Mr. Valdez could not show that he suffered an adverse employment action caused by the retaliation. The trial court found, as a matter of law, the second point, and that is that Mr. Valdez did not suffer an adverse employment action. They did not rule on the issue of whether or not he engaged in a protected activity because this is a de novo review. Of course, we raised both issues on appeal, or discussed both issues on appeal. Our position is pretty straightforward in this case. We believe that the summary judgment evidence created a genuine issue of material fact concerning whether Mr. Valdez engaged in a protected activity. In other words, there is an issue of fact regarding whether it was reasonable for Mr. Valdez to believe that the conduct reported by him violated the laws against gender discrimination. We also believe that the summary judgment evidence created a genuine issue of material fact concerning whether Mr. Valdez suffered an adverse employment action. You know, that's kind of an interesting concept, whether an employee believes that it was reasonable. I mean, I assume that that reasonable belief assumes the knowledge of the law, some knowledge of the law. So the rule is that under Title VII, an employee engages in protected activity. If the employee opposes the practice, the employee believes violated the laws. I understand, but in other words, if you believed that Title VII protected green hair, and he says, you know, I didn't know. I mean, I thought it protected all employment discrimination. That's my belief because I'm not a lawyer. Does that satisfy that he is protesting a practice made unlawful by Title VII because he was discriminated against on the basis of the color of his hair? No, sir. The test is objective reasonableness. We believe that that's a jury issue. So, objective. Now, that would be a legal issue, wouldn't it? Objective reasonableness? Well, it would a person, and is it reasonable for Mr. Valdez to believe that the conduct violated Title VII? No, but you're not saying that. You just said the opposite of that. It's whether an objective person would believe, not Mr. Valdez. Yes, an objective person, but I believe that would be a jury question, a question for the jury that could be easily handled with the, did Mr. Valdez engage in a protected activity and with the definition of a protected activity. How do you define objective person? I mean, that's just not to hold up your argument anymore, but. I'm sorry, what was that? I said, how would you define objective person? How would you instruct the jury to determine what kind of knowledge would an objective person have to have? I would just, an employee, I would define protected activity as an employee opposes a practice the employee believes or reasonably believes was violated the laws against gender discrimination. I think that would, you would still have to show, I mean, it would have to be reasonable. In other words, I believe that, you know, they made a comment about the color green. Obviously, I think the jury as well. Go ahead with the argument. I'm sorry to interrupt you. Go ahead. The, as I was saying, we also believe that the summary judgment evidence was sufficient to show that Mr. Valdez suffered an adverse employment action. We believe that the child court in making. What is the adverse employment action he suffered? In this case, the, there were two. One was, he was, and I'll get to the facts. Adverse employment action has to be inflicted by the company or by the hospital. Yes, sir. Okay. So what did the hospital do to him? I'll outline the evidence in a few minutes, but we believe that the, or I may do it here, but the one was they put him, he was reprimanded and placed on a training program based upon false reports that were filed by the people that he had complained about. The person who had, and the evidence in this is he reported the conduct on March 2nd, 2011 from March 2nd to March 7th. The nurses whom he complained about filed false reports with the supervisor, um, saying that Mr. Valdez about, you know, violated the rules of violating the procedure, violating the protocols. Are you saying, are you saying that management knew that there were faults? Well, yes, that's what the summary judge, for the purposes of summary judgment evidence, Mr. Valdez said when he met with the manager, he told the manager that, or the department head, that the reports were false. He told her that they were being filed because, as retaliation because he had reported them. He asked for an opportunity to rebut those, those, uh, reports and was not given that, that opportunity. But he was told also that everybody, whether they're false or not, are sent to training, and that was, that was what happened to him, is that right? Well, he was reprimanded and sent to training. But he never, did he ever go to the training sessions? He, well, he attempted to, and what happened was he worked the graveyard shift. He worked the overnight, the overnight shift. Um, and this was also one of his claims of retaliation is they specifically set that training during the, the, the day hours, during the daytime, and he was, you know, he had, he, he made them, but he was unable to make all of them. One, because he was subject to a subpoena where he had to go testify in a criminal case involving some, not him, involving somebody completely different, um, in, down in, uh, um, in Midland. And so that was one training session that he missed. I believe another training session he missed was just simply because of a funeral or illness in his family. But, um, the other, there's no other. Did, did, did his company require him to go to work the night before and then do the training the, the next morning? Yes, sir. And how long was that training? Well, it would be during the day. I mean, the next day. I don't know exactly what time the training was set up during the day, but it was the, uh. I mean, was, was it part of his work schedule is my question. No, sir. No, sir. It was, it was apart from his work schedule. And that, that was one of the difficulties he had with the other. So after the training, he was required to still come back to do his night shift? Yes, sir. Yes, sir. And so, um, um, so anyways, he felt, he felt like the, and it was also a reprimand as well that came along with that. And the test is, of course, is, you know, would it dissuade, um, it's considered an adverse employment action if it would dissuade a, a reasonable worker from making a charge of discrimination. If I'm going to make a charge of discrimination against an individual, and knowing that if I do, then that individual is going to be able to file false reports against me that my supervisor is going to take. Well, did. Without ever giving me an opportunity to respond. Did the supervisor investigate the, the report itself though? No. And determine, and after investigation, and determine that maybe the reports were accurate and therefore, uh, your client needed additional training? I don't know if the, uh, the, the reports happened between March 2nd and March 7th. Mr. Valderez was advised of the reports when he was reprimanded on March 7th. He asked for an opportunity to respond to them and was not given that. As far as what Ms. Leal, who was the supervisor, knew or didn't know. I don't know what kind of investigation she could have performed within a few days that did not involve talking to Mr. Valderez. Okay, and when was he first ordered to go to train in March 8th? It was at the March 7th meeting. Okay. And then, um, so that would be the one. The other one would be the termination of his employment. And it's, uh, it's an interesting set of facts surrounding the termination of his employment in this case. Um, the evidence shows that Mr. Valderez met with the Human Resources Director, Ms. Leal. Uh, Candace Newton was the Human Resources Director. He also met with Ms. Leal and a few others. Um, his wife was present at the meeting. She filed a supporting affidavit in this case. Um, and he, the meeting was set up because Mr. Valderez had concerns that being a piping nurse requires the nurses working together. So he put in his affidavit that, you know, the nurses have to assist you dealing with infants and pediatrics and it's intensive care. And, uh, that the nurses had quit doing that in addition to following the false reports. They weren't working with them. Um, he, uh, at that meeting advised the HR Director, Ms. Leal, that he would not be able to continue as a piping nurse, uh, because of the retaliation, the ongoing retaliation that he was experiencing. In other words, they're not working with him. He felt like he was putting himself in a position where something bad could happen towards one of the patients. And, um, and he wanted, he was asking for them to stop the retaliation. Um, the evidence shows, uh, interestingly that, uh, UMC at that time did not offer or make any effort to say, okay, we'll stop the retaliation. Instead, and what the, um, summary judgment evidence shows is that Candace Newton, the HR representative for, um, UMC, told Mr. Valderez that he could transfer from piping to another department. Well, at some point, didn't Ms. Leal go to the, to the, uh, people that were harassing him and tell them to stop or something like that? Yeah, this is before the retaliation. Yes, sir. Um, on March 2nd is when he reported the, uh, the conduct. And so, on March 2nd, Ms. Leal went to the workers. And, in fact, I think she went to the workers and said, you know, Mr. Valderez is complaining. This is, it needs to stop. And that's from March 2nd. That happened on March 2nd. From March 2nd to March 7th is when the retaliation, the false reports were made. They stopped working with him or assisting him properly. So, the, um, uh, at that meeting, uh, Ms. Newton and the affidavit from Mr. Valderez says explicitly, you know, uh, told Mr. Valderez that there were nursing positions available for him to transfer to. Uh, that he simply needed to choose a position and he would be able to transfer to that position. Uh, Mr. Valderez specifically told Ms. Newton that he could not afford to lose his job and was told by Ms. Newton that he was not resigning, but he was applying. And he was not going to, the policy said he would resign and he would apply with all the other applicants for a job in a new, with a new position. Ms. Newton specifically told, uh, Mr. Valderez that she was making an exception for him, um, in order where he was not going to have to resign and follow, uh, the standard application process to, to go into a new department. Did he believe that Ms. Leal had that authority to give him that exception? Ms. Newton was the Director of Human Resources and we believe that she did. Ms. Newton told him, not Ms. Leal? Yes, oh, it was Ms. Newton. When he, uh, he accepted that and then later on that day when he went to the, um, recruiting office to transfer to a new department he was told no, you have resigned and you need to reapply with the, um, as any other new applicant. In other words, you're not, you're not going to simply be transferred. The, um, um, Mr. Valderez's position in the case is he, he was duped into, into resigning and it was part of the retaliation, um, that was, um, against him. The, the trial court, we believe, failed to follow the, the rules of summary judgment as far as just the simple, the basic, um, you know, you're supposed to infer any disputed facts in favor of the non-moving party and make all reasonable inferences into, you know, in favor of the non-moving party. So, with regard to the, um, termination, the UMC had said. Let me, let me, the claim you're making is that, uh, all, that all of this was retaliation for his having earlier complained about the harassment he was receiving from the nurses. Yes, sir. Yes, sir. He had complained about, about a four-month period of time of conduct by the nurses where they were just making derogatory remarks, um, you know. And he complained about that. Yes, sir. And that is the basis of the, that he, uh, complained about a practice made unlawful by Title VII. Yes, sir. And all the other, uh, adverse actions that occurred to him flowed from that protest is what you're saying. Yes, sir. He had made that report on March 2nd. On March 7th, he was brought into the city hall's office, reprimanded, placed on a training program based upon what he claimed were false reports. We understand those facts are disputed, but the, but his, and the purposes of some of the judgment, his evidence is to, uh, his testimony is to be taken as true. Uh, but, yeah, that they, and then on March 7th, he was placed on the training program. Uh, from March 7th until I think it was April 11th, within about a month, uh, the, um, is when he met with them again to discuss all of this retaliation is occurring. I'm not able to perform my duties. And they, instead of attempting to stop the retaliation at that point, offered him a transfer, said they were going to make an exception for him. Uh, did not do that. Uh, we believe that creates a genuine issue material fact on the, uh, on the issue of adverse employment action. Thank you very much. Okay, thank you. Mr. Dennis, we'll have a mute. Okay. My name is Don Dennis and I represent GMC. GMC is large public hospital in Lubbock, Texas. Mr. Valderez was an employee there in the pediatric intensive care unit. He transferred that department a short time before the incidents that we're here about arose. Um, he had not been in that position for, uh, a whole year as the policy on transfers provides. Um, we believe the evidence shows that Mr. Valderez has probably some unique sensibilities. Um, the evidence for some judgment purposes shows that he was kidding about a relationship with one of his friends, a male friend, and implications that there was a question about his sexual orientation. He also claims... I mean, was he, was he known? I mean, was he out of the closet, so to speak? Your Honor, for purposes of this argument, he says he is not a homosexual. Okay. And, and... So, I mean... The record does not indicate that he ever was. Okay. The kidding, though, involved that. It also, he also... Where does it come in about his wife? I mean, who created those kind of terms for his wife was there? Is that, like at some reprimand session, his wife was there? That's down the line. But whose wife is that? Is that a male wife? No, it's his female wife. Oh, okay. I thought they were referring to... Do I think there's anything to do with the fact that they claimed or made comments about so-and-so is your boyfriend, has your boyfriend been... This is kidding that goes on with nurses. Okay. I don't believe it. Oh, okay. I thought, I thought he was out of the closet. No. That's right. But discrimination on perceived sexual orientation is not a violation of the title statement. At least as it stands now. There was other kidding going on, too, based on his statements. He says he was kidding that, or the nurse would make statements, the female nurses would make statements that he was not a student nurse because he wasn't female or you don't get this because you're not a guy. He characterized it all the time. It happens all the time. And that's one of the problems with the plaintiff's case is that he tries to base his case on assumptions, characterizations, conclusions, and unreasonable inferences. For example, he says, I was harassed, but he doesn't have clarity about the facts, which would allegedly create harassment as far as pervasiveness and severity. And another claim that's a moving target in this case is who was doing this? Both the retaliation, the claimed retaliation, and the claimed initial harassment. In his pleadings, he calls them co-workers. Other places, he calls them the female nurses. And then when he has to, he calls them, well, they were my supervisors. But obviously, the hospital took those claims serious and investigated those claims and concluded. I mean, if they didn't think that it was a violation of any sort of rule, whether in-house or not, they simply would not have investigated them. But what I appreciate the facts were they took his complaint and they investigated his complaint. And then they determined that he was the one who would need training, right? He was the one who was being punished? He was the one who would need additional training. I still didn't understand. They investigated. He went to management and said, my co-workers are saying all these things about me. Management then investigated those charges, right? Well, I think they took them at face value. And they took them at face value, called a meeting. Those co-workers said stop it. And stop that. I mean, so if they didn't think that that was a problem working with their workforce, they probably wouldn't even have done that, right? But keep in mind that management takes action to stop things from going on in the workforce all the time, whether they're discriminatory or not, whether they rise to the level of harassment or not. There's no reason for a manager to put up with conduct like this, whether it's illegal or not. Stop it. This doesn't help the workforce. You know, you kid somebody about having green hair. That doesn't help things. But in this instance here he was talking about, they're talking about my sexuality, my perceived sexuality. And is it the hospital's position that a claim such as that does not touch on Title VII? Yes. It's our position that a claim of perceived sexual orientation is not a prohibited characteristic. It's not a protected characteristic. How does that fly with ONCAL and the other cases from this circuit and from the Supreme Court? Well, I didn't—I briefed that in my brief, but the law is that—I think the law is settled in that, and the cases are set forth in my brief. Now, discrimination because of sex or gender is prohibited. And the position of the plaintiff is, the comments that you're not a nurse because you're a guy, you're not—you don't get it because you're a guy, their position is those are gender-based and are sufficient to be a violation of the law. It's harassment. Okay, so he complained. He complained. It was stopped. It was stopped. Okay. Now he claims that they retaliated against me because I complained. Right. Yeah. Then again, what was the retaliation? Well, I was ostracized. There's another one of those conclusions. I was ostracized. His retaliation claim says I was sent to training. He said I was forced—I was the one who was forced to go to training. That was another thing. He said he was sent to training. But there's nothing to indicate that that was the result of retaliation. There were reports, and it's interesting that he does not come forward and show that those reports were false. There are medication orders. There are records of medication given. A supervisor can look at those and tell whether the medication was provided correctly. Now, if it's not and there's a question about patients not getting their medication in time, a diligent supervisor is going to do something about that. And this diligent supervisor said, you're going to have some training. Now, that doesn't make that training punitive. It just makes the training necessary. And how is training punitive? You get paid for the training. There's nothing to indicate. He was expected to get the training without being paid for it, and it improves his ability. In fact, he complained before that he wanted training and didn't get it. Was he required to do the training right after his shift? Because what I heard today was— I don't think any of that is in the record. The specifics of that aren't in the record. And, again, the plaintiff tries to make his case on conclusions, assumptions, and presumptions of facts that aren't in the record. This case was on file, I think, about 14 months before assembly judgment was granted. The plaintiff had the opportunity to take depositions. No depositions. Well, it's not in the record. But he had an opportunity to take depositions, an opportunity to send discovery during this time. Yet he still relies on presumptions and characterizations and conclusions rather than getting to the facts. Now, after he complained, the next complaint level was to Ms. Leal and Ms. Newton. And his complaint at that time was, I was ostracized. They made me take training. They're not helping me. Again, it's amorphous generalization that I'm being retaliated against because they're not helping me and assisting me with my work. There's no place in the record that explains how the details of that were, how often it happened, when it happened, was it serious, what kind of ostracization. Those are all subjective conclusions on his part. They're the shortcut for facts, which he cannot show. And, again, we get back to the situation. He's working with female workers. He calls them co-workers, sometimes the female nurses. And occasionally he will say, oh, yep, they were my supervisors, without any proof of what authority they had over him. And I think the case law is clear that to be a supervisor, you have to have some authority other than just simply, will you go in and take care of this patient? You'll take care of that patient. And there's no proof in the record showing what retaliation, quote, retaliation, was by his co-workers and which, if any, was by a supervisor that really had a control over some significant aspect of his employment. That's just not in there. It's a general statement. Nurses ostracized me. Nurses wouldn't help me. What are the details? There aren't details. I know he does raise that issue with respect to the other nurses would not help me, would not have my back or whatever. Is that supported by the record, though, or are these just statements in the press? That's a conclusion. That's a conclusion without specific instance showing which nurses. Because retaliation is something the employer does. It's not something a co-worker does. And I think the law in this circuit and a lot of other circuits is clear on this. And I think it's more stringent in this circuit than a lot of circuits that before you hold a employee responsible for retaliatory act, you've got to show it is by a supervisor, not by a co-worker. And is there any evidence that he reported to his supervisors that these nurses were not backing him up in that unit? Because obviously it's important for nurses to back each other up in the PQ, right? I don't think there's evidence of that in the record that he reported. What happened ultimately was he was unhappy. He was unhappy. His perception, at least according to his affidavit, was they're not helping me. They're ostracizing me. And they made complaints against me, and those are false. And I can't prove they're false, but maybe if I hadn't, I could. And yet he didn't get them in discovery and did not come forward to show that they were in fact false. There's no showing that the nurse manager who made the decision to require the training thought that they were false. So we've got an unhappy employee here. Now management did put him on call, right? Put him on call. That's what I'm getting to from the sequence of events. So we've got an unhappy employee here, and he wants to meet with Ms. Leal. She gets the HR director involved. They have a meeting. He says, I'm unhappy, basically. I think it's unsafe working where I am. Sometimes he says it's unsafe because they won't help me. Sometimes he just says it's unsafe. But that's what he expresses. And the HR manager, trying to do the right thing, trying to solve the problem, which is what they're paid to do, just like lawyers are paid to do, says, what kind of solution can we come up with? So she says, well, you haven't been in this job for a year, and so you're not eligible for transfer. But I'm going to make an exception for you. I'm going to allow you to transfer even though you haven't been here a year. So that's the discussion. You need to go contact the nurse recruiter, find another position. We'll leave you on on-call status. Even though he wasn't working in that department, he was taken out of that position. He had a full-time position in pediatric and contingent care. He was taken out of that position and put on call, which kept him on the books, on the database as an employee. But he lost benefits and he lost payment and benefits. Well, I think the benefits continued for some time. That's really unclear under the record. What is clear under the record is that this occurred on, like, April 11th. It wasn't until later in that month before he was transferred officially to on-call status. And it wasn't until June 24th when a personal action form said that he was terminated, but it said taken off payroll. But being on on-call status, does that reduce the pay and benefits that he was getting? There's not an allegation that he was deprived of benefits and that that was retaliation. Where they left it that day was, hey, normally you can't transfer. We'll waive that part of the rule. In essence, we'll waive that part of the rule. You need to contact nurse recruiting to find a position. That's not retaliatory treatment. That's extraordinary treatment. Now, here again we have the subjective impressions of Mr. Valderez, who believes, based on that, that he can have any position he wants. Just have to pick one. I think that's in the record. If I just have to pick one, I'll get it. Without regard to whether they're more qualified applicants, more senior applicants, whether he's the best person for the job or any of that. What was told him during that meeting? What does a hospital contend was told to him during that meeting? There was a conflict between his statement at the hospital and several witnesses. After they would say he was told that he would have to apply for an interview at Jobs. He says, they never told me that. In his deposition, I asked him, pointed to him, did they ever tell you you didn't have to interview? No. Did they tell you you would have a preference? No. The line of question, that one. So where he thought he was going to be after this meeting was, I'm not going to be working because I'm taken out of that position. I'll need to interview. But he admits that he understands the transfer policy, that you've got to apply, and the department director has to accept you before you can transfer to another department. It's not just you pick one and you just go there. He admits that and understands that. And he actually did apply. So after the meeting, he claims that he called and they said, call nurse recruiting, and they said, well, you're terminated. You have to apply and interview for a job. Okay. Well, so that's what happens when you transfer. So was he terminated? Does it matter what you call it, how you characterize it? What substantially happened was you're no longer working at PICU. Everybody agrees that. He didn't want to work there. He wasn't going back to work there. His choices were to go back to PICU, which he said he would not do. His choice was to consider a transfer or quit, and he was given the opportunity, an exceptional opportunity to transfer. But the exception didn't apply to all of the other aspects of the transfer policy. It was never discussed. He just assumed they did. And when he contacted them, he said, you mean I have to reapply? I have to reapply and interview? Oh, my gosh, I must be terminated. And he says, they told me I was terminated. Now, that could be a misunderstanding. There's no proof that anybody with authority to terminate him told him that. They coded him out of the system, didn't they? Excuse me? Didn't they mark his file not employed here anymore? No, no. There was no action on his personnel file until, I believe, late April. At that time, it said transferred on-call status. And then there's a scheduling policy that requires on-call to work four shifts over four weeks. And if you're not, then they take you off the ledger as employed. But, in effect, when you quit, when you don't have a position, you're no longer seeing a paycheck for working, that's when you—I mean, but you're on the books. Not on the books. You don't have a position. You're not getting paid. He understood, or should have understood, that he needed to go interview, and he didn't. He interviewed twice. Kind of halfway interviews, and there were other positions available. He didn't do it. He made the decision not to stay with UMC. He cannot—there's no evidence that this was a ruse. That's his characterization. That's his assumption because it serves his purpose. The affidavit that he did that conflicts directly with the testimony of the HR person, was that affidavit submitted post his deposition? Had he been deposed and answered all those questions that you said he had answered? And then does this affidavit conflict with that deposition testimony? In some respect, it does. He does not—he says, I was not told I had to interview. But he wasn't. I think what he said was, basically, I assumed I didn't have to interview because they didn't say I had to interview. But he understands that's the policy, that you have to interview, and you have to be accepted. So there's no evidence to show that the reason he no longer is at UMC is because somebody wanted him gone for retaliation for a person. He's not there anymore because he chose not to interview and pursue that diligently. Thank you very much. Thank you, sir. Okay, Mr. Johnston, we'll hear from you. Thank you. I guess the first issue is there was a question about how is the training punitive? And I just want to—I'm going to read from the affidavit. With regard to the affidavit, I do not believe that it contradicted the deposition at all. Had the deposition out, we went through it as we were preparing the affidavit to make efforts to make sure that it didn't contradict any of the deposition testimony, make sure it was consistent. Why did he file an affidavit after he had testified? Because the affidavit was directly related to the points being made in the motion for summary judgment. The deposition was a deposition taken by defense, and so it didn't address the—it wasn't the testimony that we were going to bring out at trial. And the affidavit was more pointed towards those issues, as we saw, the important issues. With regard to the training, in his affidavit he says, instead of allowing me a chance to defend myself against the allegations, Ms. Leal told me that I had to undergo additional training because of the complaints. She also told me that the training was being crafted in part by the female nurses that I had complained about and that I had told Ms. Leal I had been retaliating against me. Prior to making the harassment discrimination complaint, I had requested additional training numerous times, and it had always been refused. The training that was ordered after I made the complaint was not the type of training that I had been requesting, but was instead punitive in nature and was scheduled at times that made it very difficult for me to successfully complete the training. Does he say why it was punitive in nature? Well, part of it—a big part of it was the scheduling of it. In this regard, though I worked nights, no efforts were made to set up night training, but all training was to be done during times I would ordinarily be asleep. It is my belief that the training was not designed to assist me, but was designed so the Department would be able to manufacture an excuse to terminate my employment. Does he have any—does he supply any evidence for that? Well, I think the scheduling of the training—if I work a 9-to-5 job and you schedule additional training for me at 3.30 in the morning, that's— What time? How long was his—how long was the training session? I don't know. I think it was at least an hour or two, but it was being scheduled in the middle of the day— He would have to come in at 3.30 in the morning and stay until 4.30 in the morning and then go back home? In context, remember, he worked very much. If I was just using that as an analogy, he worked overnight hours. He would have to come ordinarily when he was sleeping at, let's say, 2 o'clock in the afternoon, do his training, and then— So he would have to come in to work an hour early or stay an hour late to get the training? Well, it wasn't scheduled that way. It was scheduled in the middle of the following day, or it was not scheduled on the—it wasn't bookended on the— He would have to come back from home, do the hour schedule, and then go back home? Yes, sir. Awesome. And then come back and do it. And with regard to the meeting with the HR director where his employment was ended, first, he was taken out of the full-time position and placed on off-call, and I would believe that that's an analogy. Yeah, but now that was—as I understand it, and you can tell me if I'm wrong, but he requested a transfer. He was not going to work in that department any longer. He asked for a transfer. Well, his hope was— Is that right? So far, is that right? I'm just going to—I'm going to read the affidavit, if that's okay, because he addresses it more clearly than I will. He wanted the department to correct the retaliation. He was not going to be able to do the work the way it was going. The department offered him the transfer. The HR director offered him. He said, I'm not going to be able to continue working in piping. This is where—the chalkboard just accepted everything UMC said as factual and ignored the controversial statements that Mr. Valdez made in his affidavit. He said that Ms. Newton, instead of stating that she would take steps to correct the problems I was having, instead suggested that I transfer out of piping into another department. In doing so, she explicitly and clearly told me that there were nursing positions available for me to transfer out of the department and that all I needed to do was choose one and I would be transferred to that department. I was specifically told by Ms. Newton that I was transferring, not that I was resigning and applying for a job in another department. In fact, she stated that she was making an exception for me to do that. I agreed to do the transfer based upon the specific statements by Ms. Newton, the HR director, that it was in fact a transfer. I told her that I could not afford to lose my job because of a number of reasons, and she assured me that I was not losing my job. It was simply making a transfer to an existing position. I did not misunderstand what the HR director told me, and I relied upon her representations in agreeing to the transfer. She then told me to report back. Did he ever come back to her and complain and say, look, I misunderstood you. You required me to transfer, which means I've got to resign my job. I don't want to do that. Did he ever come back to her? Was there any further discussion about that? He went to the recruiting office and it was closed. He went later on that day and was told that he had been removed from, that he had lost his job. He did not have that record. He told him that? Well, in fact, it's not in the record, Your Honor, but I did send a letter to Ms. Newton myself because he came to me at that point. I sent a letter trying to get agreed and started to try to correct that, and it was not ever considered or done or anything like that. So yeah, we did, but it's not part of the record. Yes, sir. But it's not part of the record that he ever went back to her at any time and said, look, we had a misunderstanding. You've sent me over there. They tell me I've got to transfer and start all over and that all I can do is bid on these jobs. It is not part of the record before the court, but I'm telling you it was done. It was done by me. By you? Yes, sir. It was done by you some months later? No, some weeks later. Within April of 2011. But the same day that he got the bad news to him that he was not going to be automatically transferred, he accepted that and never complained about that until he hired you, is that correct? He called me, I think, the next day and said, this is going on. What can we do? And I suggested we probably do this because that was in a hospital process at that point. It was, sir. He felt like he couldn't go back to Ms. Leal or Ms. Newton. But he did file a grievance. Is that what you're saying? Well, we attempted to. They said because you're no longer employed, you can't file a grievance. It is what they said about it. In other words, if they put him on call, he was not employed. Yes, sir. Although he was employed, on call means that he would come in and fill a vacancy if someone was out or absent? What does that mean? Yes, sir. You're basically a part-time employee. Substitute, essentially, you go and fill a vacancy. Substitute employee. And does that provide, if he had wanted to accept the calls, could he have been employed regularly? I mean, 40 hours a week? There were no assurances of eventually, within a couple of months, he was able to apply for and get a job with a whole different entity. Because he needed to work. But there was, at that point in time, no. There wasn't. And his concern was he felt like it was going to be real difficult to go through the application process simply because he had not. Okay. Now, somewhere in this morass of evidence and so on, I thought I had seen that he did not accept the on-call opportunities that he had. And that's why he was eventually taken off the on-call list because he would not accept the on-call request. Is that right or wrong? That is correct. He did not. He felt like he needed to be working full-time, so he was seeking employment elsewhere and felt that he bridged with UNC. And so while he was seeking employment elsewhere and was unemployed, he was rejecting the on-call offers that the hospital made to him. Is that right or wrong? I know that he was never put on on-call. I really don't know, Your Honor, if he was ever told that there was an on-call position available on any given day. I'm not familiar with that part of the record. Are you telling me he didn't know he was on-call? No, that he knew he was on-call, but I don't know that there was ever a call made to him saying, hey, we have this position. Can you come in and work today? That part I don't know. I don't want to make any misrepresentation. I don't know. Well, if he— I'm not sure what the process is. He did not say whether there were any opportunities one way or the other. He did not say yes or no as to whether he had an opportunity on the on-call docket to work full-time. That's not in the record? No, not that specific statement. I believe the on-call, by its nature, is part-time. It's not. I don't believe there's 40 hours of work available on on-call. Well, I mean, what does the record say? It doesn't say anything about it, no. So we don't have any definition of what on-call—nobody put into the record what on-call means? No, sir. Oh, okay. So it could mean 40 hours a week, 60 hours a week, or 10 hours a week. Well, I think the general understanding is it's a part-time nature. That's my belief, and I believe that's just the general understanding of the term. If someone is incredibly understaffed, then yes, it could be a full-time. If you get 40 hours, but you're not considered a full-time employee.  Thank you, Your Honor. Thank you. That completes the arguments that we have on the oral argument calendar for today. Indeed, it completes the arguments that this panel has for this week.